And we're here counseling our last case today, which is Niagara Blower Company. Continuing our Erie County Day. Good afternoon, Your Honor. Oops, sorry about that. May it please the Court, I'm Randy Sullivan here on behalf of appellant Niagara Blower Company. We respectfully submit that the district court in this matter erred in denying the company's petition to vacate the underlying arbitration award, both because the award violates explicit and well-defined public policy, and also because the arbitrator exceeded his authority in rendering the award. The arbitrator found in this matter that the grievant, who was a welder at Niagara Blower's manufacturing facility, and he was performing safety-sensitive functions in that environment, reported for work impaired by alcohol, at a blood alcohol concentration likely at .09 percent, which exceeds the prima facie standard for driving while intoxicated under New York law. And as a result of this, that he was adversely or would have adversely impaired his ability to function in the manufacturing environment. The arbitrator didn't say this wasn't a violation, and the arbitrator didn't say he was allowed to continue to work while impaired, and the arbitrator did not say that he could not be disciplined and indeed imposed a rather severe discipline in the form of two or three weeks of suspension without pay. Right? That's correct, yes. So the issue properly as far as public policy is, are you contending that there is a public policy that anyone who ever shows up intoxicated by .01 percent above the legal driving limit can be summarily dismissed or must be, as a matter of public policy, summarily dismissed, and an arbitrator's decision that that's not the case is a violation of public policy? No, Your Honor. Our argument is that the standard applied by the arbitrator, he set a standard, a requirement that said termination, there was not proper cause for termination because there was no adverse consequence. No, he didn't say that either. He said that was one of the factors he considered was that there was nothing that, you know, he apparently conducted himself adequately at work as far as the record showed, and that seems to me to be a factor that counts at least in favor of something other than termination. Well, the arbitrator said because there was no adverse consequence, all we had was the potential for it. Yes, and he also said that a second offense would justify firing. So, I mean, it's not as if the arbitrator was making some absolute rule here. The arbitrator was taking into account various things. It was a first offense, for example, and there was no evidence of actual impaired performance. And even at that, he said the employer is entitled to discipline. A disciplinary sanction of some severity is warranted under the contract, and there's just cause for that, but not necessarily just cause for termination. So what is it about public policy that would mean that the state abhors a result like this? Well, the public policy is aimed at preventing employees from performing safety-sensitive functions while under the influence of alcohol or drugs. So we were wrong to uphold a similar arbitrator's award in a case involving a nuclear power plant? No, Your Honor, the difference with the argument we're making here, the argument in the cases relied upon by the district court and cited by the union, was that reinstatement violated public policy. And we're not saying that reinstating this grievance violated public policy. We're saying that this standard that says something bad has to happen in order for there to be proper cause to terminate. Arbitrators' awards don't set precedents, right? The next arbitration case stands on its own bottom, does it not? Your Honor, in the case that the union relied upon from this court, the Connecticut Light and Power case, this court said it is the usual practice of arbitrators to find prior awards final and binding since it is fair and reasonable to expect a decision to apply to subsequent cases of the same nature. So we would submit that there is a precedential effect. The only exceptions to that, if you have a similar fact pattern in the same parties, which would be the case here, what the court talked about in that case was the exceptions are if the first award was clearly the result of bad judgment, which we obviously are saying this was, or that initial determination award was made without relevant facts or circumstances, or there are new conditions in the second award. But we would say this absolutely, from the company's perspective, has precedential effect. And we would assume and expect that if a similar circumstance arose. So people are going to show up drunk because they'll say, well, I could drink this morning before going to work, and the worst that will happen to me is three weeks without pay, so I might as well go ahead and do it? Well, I mean, we would certainly hope not. I would hope not. But it makes the company's decisions with respect to discipline. This award says you can have exactly the same misconduct occur, but what the company can do depends on the results of that misconduct. No, it depends on whether it's a first offense or not. It depends on the totality of the circumstances, including how drunk the guy was and if he was so drunk that it impaired his performance, or maybe if his blood alcohol was something higher than .09, that would be a different case. But on all of the facts of this case, the arbitrator said this was not just cause for termination in a setting where the contract doesn't specify any particular firing offenses as being outside of that just cause standard that's left to arbitration. Well, on the exceeding authority argument, again, we would submit that the contract gives the company the express right to establish these plant rules, and not only to establish them, but to enforce them as well. And that's where the language is different than this Court's decisions in St. Mary Home and in First National Supermarkets, because the only under Section 6B of the contract, the only times that limit the company's ability to do that are if the rules are unreasonable or if they're inconsistent with some other part of the contract. And the arbitrator didn't make either of those findings. The union didn't argue that it was unreasonable, and the arbitrator expressly said any employee should reasonably expect that coming to work impaired not only is going to violate rules and expectations, but expose them to the whole range of consequences. And the arbitrator also didn't say that Section 6B or the plant rules were inconsistent with anything else. We submitted in our briefing that all he did was overlook that language and then apply, from his perspective, proper cause. And we certainly aren't saying he couldn't apply proper cause. He did. He looked at mitigating circumstances, which he found there were none. He also looked at the notice requirement, what would the employee reasonably expect. But we're saying he can't apply proper cause in a way that disregards the company's bargain for right and the word enforce in that contract provision has to be given some meaning. So let me ask you how this turned out to be a reinstatement case, because I found that troubling from the magistrate judge to the district court. It became about reinstatement. But the question before the arbitrator was the discharge of John Beller for proper cause. If not, what should the remedy be? It wasn't ñ I don't know how we got on the reinstatement kick. Any thoughts? Well, the ñ and the reinstatement from a public policy standpoint, we are submitting that the district court just looked at the wrong issue on public policy. That's not our argument at all. We're talking about the standard that was set. In terms of the reinstatement as a remedy that the arbitrator granted, I mean, we would obviously disagree with that as well, but he did reduce it from a termination to 15-day suspension with reinstatement. And the magistrate, in his report and recommendation, recommended that our petition today be granted for the exceeding authority reason that we just had been discussing. Thank you. Yes, thank you all. Mr. Giroux. Yes, may it please the Court, E. Joseph Giroux, Jr., representing the Union Shop Ironworkers. Let me first start by suggesting that I'm going to assume that you know as much about labor arbitration because of prior court decisions. You certainly know a lot more about securities law than I do, but I'm going to assume you know as much as I do, if not more, having practiced in this field for 44 years. We start with the large global picture that collective bargaining is an important public policy of this country stemming from the 30s, and the arbitration and labor arbitration, and labor arbitration was in the front of arbitration through the years. Labor arbitration is part of that collective bargaining, and great deference is given by the courts. As the Supreme Court has said, probably the most deference to anything the courts give to arbitrators' decisions. An arbitrator derives his or her authority from two sources. The first source is the collective bargaining agreement between the parties. The second source is what the parties agree to let that arbitrator, he or she, decide. In this case, we have a collective bargaining agreement that says employees shall not be disciplined or discharged without proper cause. The collective bargaining agreement says that the company has the authority to make reasonable rules, maintain those rules, and enforce them. It's a very common provision in collective bargaining agreements. I will concede that in some of the cases that this court has had the opportunity to look at where this question has arisen, St. Mary's First National, that those clauses may not use the word enforce, but enforce is a very general term. The company certainly can enforce its prohibition against coming to work impaired, staying out too late the night before and having too much to drink the night before and still having alcohol in your system when you come to work by a suspension. A suspension of 15 days, three working weeks is certainly a significant penalty. So that, the collective bargaining agreement then provides for the grievance and arbitration procedure and delegates to the arbitrator the authority to interpret and apply the collective bargaining agreement. Now, the arbitrator has to stay within the framework of that collective bargaining agreement, has to interpret what that collective bargaining agreement means. Can I ask you about that? So one of the work rules is it's an intolerable violation to show up with alcohol in your system and work under the influence. Automatic termination may result. So that's the work rule. Is the arbitrator, well, I probably have the wording wrong, but that was one of the work rules. Was the arbitrator bound by that or not? No, Your Honor, and I'll tell you why, or I'll try to convince you why. But first let me back up. The work rule, when you read it, says intolerable violation, immediate termination, then goes on to define what offenses, what misconduct falls within that category, intolerable violations, and then goes on to say that it may result in discipline up to and including termination. I think that's the precise language. So it's not an absolute clear cut. There was also an employee handbook provision which talked about rehabilitation when there was an alcohol or a drug problem. The arbitrator's role, those work rules are not negotiated. Parties can negotiate work rules. Those work rules were not negotiated. The union conceded that they had the right to establish them, but that does not include the right to say this is going to be the automatic penalty for violation of that work rule. And that's, in fact, what this Court has said starting from Justice Marshall in the Otis Elevator case back in the very early days to First National and St. Mary's where this Court has said if an employer wants discharge to be an automatic penalty for an offense, it needs to bargain that because the terms just cause or proper cause are not defined in this contract, in many contracts, and arbitrators now are charged with interpreting that. What does proper cause mean? What does just cause mean? In addition, the authority derives from what the parties say they want the arbitrator to decide. Here it was, was the discharge of John for proper cause? If not, what is the remedy? That's what the arbitrator decided. He decided that the penalty was disproportionate to the offense given the fact that there was, and considering that there was no indication that he was impaired during the approximately three hours that he was working on the job. There was no indication of impairment. His work was, there was no complaint about the work he was doing. So we have those three cases from this Court, and that an arbitrator can interpret, should be interpreting what proper cause or just cause is, and there is no restriction in this contract on that arbitrator's authority. Yes, Judge. In this instance, do we have a standing arbitrator or an ad hoc arbitrator? Ad hoc arbitrator, Your Honor, I believe selected through the Federal Mediation and Conciliation Service. So that particular arbitrator would not have, there would not be a record of the decisions of that arbitrator over time with respect to a particular charge? Well, the parties would certainly have the arbitration decision. The union has the arbitration decision. The company has the arbitration decision. One would hope from the union's perspective that if the company was confronted with a case of similar nature in the future, the company would give great consideration to, okay, some penalty is in order. Is there a problem? Should the employee be sent to, compelled to some type of evaluation, substance abuse evaluation, alcohol abuse? What I was getting at is this is not a situation where, as they say in New York labor circles, where we have a so-called, what is the phrase, impartial chairman or something of that sort. No. No. It's an ad hoc single arbitrator. Let me move very quickly to the, because I have some limited time here, very quickly to the public policy argument. I must confess I have a hard time grasping this argument, particularly in view of not only the MISCO decision, the Eastern Coal decision, this court's decision, and IBW 97 versus Niagara-Mohawk, where with varying degrees of misconduct, in Eastern Coal, that particular employee was reinstated twice. The first for testing positive for drugs, and was a DOT-regulated employee, where there is regulations that deal with employees. In order for there to be public policy, then the employee, after reinstated by an arbitrator, under conditions and with a penalty, tested positive a second time. That union took it back to arbitration. The mine workers took it back to arbitration. He was reinstated a second time. And that's the award that was being challenged under public policy, and the Supreme Court denied that challenge. In order for this award to violate public policy, the policy has got to be, we would contend, explicit and dominant. And interestingly enough, well, Eastern Coal could point to the DOT regulations. Niagara-Mohawk could point to the NRC, the Nuclear Regulatory Commission regulations. And the strong policy there, neither of which require discharge of an employee. Niagara Blower has not pointed to any regulation. The only public policy would be the very general Drug-Free Workplace Act, which does not require a discharge. Thank you. Mr. Sullivan? Yes, thank you, Your Honor. Just to address a couple of points. The public policy issue, as we said in our briefing, we submit this is a case of first instance. We have not seen any other cases where the arbitrator sets a requirement, as we read the award, for something bad to happen. And typically, the grievant proper cause is said to not be there because of some mitigating circumstance. Length of tenure or good work record or rehabilitation or something, none of that was present in this case. This was purely a case where the arbitrator found because there was no adverse consequence, because nothing happened, that there wasn't proper cause. And so what we're pointing to is the public policy that's been expressed in a wide variety of cases. We cited one from the Northern District of New York, which relied upon a First Circuit case. The First Circuit case cites the Third Circuit, Fifth Circuit, a number of different cases for the proposition that there is a clearly defined, dominant public policy against having employees perform safety-sensitive functions while impaired by alcohol. And interestingly, the First Circuit case. Kennedy, do those cases say there is a public policy against reinstating or against something other than a severe penalty short of termination for someone in those circumstances? No, Your Honor. And that's the question. Isn't that the point? I mean, no one is saying that there isn't a public policy against having employees show up intoxicated. And no one is saying that Niagara Blower can't discipline, indeed, the arbitrator disciplined someone in that circumstance. So I don't see why a public policy against intoxication even needs to come into the case. No one is suggesting that intoxicated workers should be allowed to roam the halls even in non-safety-sensitive positions. The question is, is there a public policy that requires the termination of anyone who shows up with over .08 percent blood alcohol even in the absence of any demonstrated adverse effect on performance? Is there a public policy that you can cite about that? Because that's what the arbitrator ruled here. Well, no, there's not that sort of public policy to our knowledge. But, again, the public policy we're citing is designed to avoid the misconduct initially, not to wait and see what happens from the misconduct, which is what we submit the arbitrator is doing. And so we would say this award goes directly contrary to the public policy that says you're not supposed to have the misconduct to begin with. And certainly Niagara Blower shouldn't be in a position of having to base its discipline on what happens as a result of the misconduct, rather than saying we're going to prohibit this misconduct to begin with, which is the whole purpose of the plant rule. Thanks very much, Mr. Sullivan. We reserve decision, and we're adjourned. Thank you.